The lighting system tells you how much time you have left, and then when it turns amber, you have two minutes, and when it turns red, you should finish your thought and complete your presentation. Rebuttal is for rebuttal only. You should not raise new issues. And with that, we'll call the first case of the morning, Midwest Feeders, Incorporated v. Bank of Franklin. Mr. Sandberg. Good morning, Your Honors, and may it please the Court. This is a case of facilitated theft. $30 million was stolen, and the theft was not accomplished at a cattle auction or a feed yard. The thief conducted the scheme at a bank. This was not a fraud or theft scheme that happened to involve a bank. This was a banking scheme that involved theft and fraud. The thief could not have accomplished what he did without the assistance of a friendly bank. I'm willing to wager that no one in this courtroom has ever written a check to someone and then simultaneously asked that person to endorse their own check right back to them so you could go deposit that check, your own check, in your own account. And I'll certainly wager that no one has done this with checks in six-figure amounts over and over again. And you've got a, your client has a big judgment against Rawls, right? That's correct, an uncollectible, uncollected judgment, Your Honor. All hat and no cuddle, as they say. None of the cases cited by any party involve the kind of checks at issue in this case, the precise kind of checks. These kind of checks are beyond suspicious. They have no conceivable business or personal purpose. They're not used in the cattle industry or any other industry. And in the banking industry, they use words like red flag and irregular on its face and commercially unreasonable to describe these checks. Yet Bank of Franklin processed and accepted thousands of these kind of checks, totaling hundreds of millions of dollars in a staggering velocity. Contrary to what has been argued, we don't claim that Bank of Franklin had a duty to investigate Mr. Rawls or launch some kind of investigation or to pry into his affairs or to force him to close his account or take any other extraordinary measures disclaimed in the cases cited by Bank of Franklin. All Bank of Franklin had to do is what banks do all the time when presented with questionable instruments, simply decline to accept these kind of checks. That alone would have deprived Mr. Rawls of the linchpin of his scheme. The consequence of what this asserted fraud by the bank, basically saying the bank was engaged in a fraudulent scheme, is that it ultimately caused this individual to have the inability to pay. That's what it amounts to, to pay. And hence, that means that they're liable to any other creditor of the culprit because he doesn't have the money to pay them. No. In other words, he's broke, and there's no money there, and the assets have been depleted. In other words, what's your client's relationship to this other than that your client is out broke and can't pay you? Well, we would disagree with any characterization of the money that was stolen as a large accounts receivable or some inability to pay. You know, if you run up a valid tab in valid commercial transactions and then you just don't have the money at the end of it all, that's one situation. If you defraud someone into believing there are valid- What is your claim against the Franklin Bank? Our claims are fourfold. First of all, under the UCC section 75-3404-D, that provides a claim for someone who fails to exercise ordinary care in accepting checks like this, any kind of person who accepts them, and it grants standing to the person bearing the loss. Those who are harmed are forced to bear the loss. And under a traditional tort liability theory, I think you'd have a very difficult time constructing a duty that would be violated that your client could bring because you have no real relationship to this. You simply have a person that owes you money and has been a bad conduct gone bust. Well, I will concede that- If you can, under principles of common law, derive a duty in those circumstances, then I have difficulty understanding why bear the loss should be read so broadly. What is the limit to bear the loss? If I engage in bad conduct and am unable to pay my creditors, and the fact that if I'm engaged in bad conduct with individual one, and then I go bust and I can't pay individual two, two has a lawsuit against the individual that caused me to be bust? I mean, you almost concede, let's say in another way, that you really can't construct a common law duty in tort for this, but we're going to relate the bear the loss here broadly enough to here to sweep your client into it. That's the difficulty I'm having with it. I want to share that with you so you're a good advocate. Certainly, I appreciate that. Give me some help. I mean, ordinarily, banks don't have a duty to non-customers, and I guess our question, or maybe Judge Higginbottom has expressed it better, but what case law gets you there that says under some circumstances, maybe a bank could be liable to a non-customer, and where do you draw the line? If you open the door, are there going to be all sorts of lawsuits every time somebody loses money, or how far do you go if you open the door at all, or is there any case law that says that under some limited circumstances somewhere, banks do have a duty to non-customers? There are limits on the kind of duties. I threw too many questions at you at one time. That's all right. I'll try and answer them in turn. There are limits. Every one of the cases in the negligence realm, for instance, finding, you know, that the Bank of Franklin sites finding an absence of duty to non-customers, they condition that on there not being any exceptional or extraordinary circumstances that we would claim are present in this case. There is a foreseeability limit to it. The Delta Chemical case notes that banks have a duty if they are on notice that something is afoul of reasonable commercial standards. There are two types of duties and two types of claims here. One is statutory and one is common law. And the Mississippi legislature chose to extend standing and liability and duty to those bearing the loss, and that's not a catchphrase that we came up with. If that's too broad or too far out, that's an issue to take up with the Mississippi legislature. Well, if you could just pause for a minute, just because at one point you began saying you have four-fold claims. Yes. So trying to be as rigorous as possible as to each. Yes. Instead of slipping between the common law negligence and the UCC provision. My question would be, focusing just on the statutory UCC, what case do you have anywhere in the country that allows a third-party non-customer to sue under 404D language? The Hans case that we cited. I believe it's out of Michigan. In that case, a dishonest employee tricked people into writing. The plaintiff was Hans Financial Services. He opened an account called, I think, something beginning with an H, Firearm Services, and then tricked people into writing checks to HFS. Hans wasn't a customer. Hans Financial Service wasn't a customer of the defendant bank. The checks weren't made to Hans Financial Services, and the account wasn't opened by Hans Financial Services, and yet the bank processed those checks, and the claim was allowed to go forward in that case. That's not a conversion argument. That's on the loss. That is under, yes. There's a little bit of different standards and nuances for each of the four claims, and that is under the 404D statutory claim. Right. Which wouldn't have the limiting principles you just suggested exist for, quote, exceptional circumstances in the negligence. In other words, actual knowledge of the misappropriation and ought to have known about the fiduciary relationship. That is correct. So to me, that seems pretty limitless. Well, you have to have, first of all, it's conditioned on failure to exercise ordinary care, and, second, it's a person bearing the loss. And if you have two questions about that, could we say that the UCC only contemplated the persons to be the traditional payee, payor, and wouldn't be third parties? What case contemplates personhood embracing third-party non-customers? I would say that it's every case we cite concerning just the usual principles of statutory construction. Okay. It's not as though the Mississippi legislature didn't know what a party to an instrument was or a person entitled to enforce an instrument. Those are specifically defined terms. And yet the Mississippi legislature chose not to include those specifically defined terms in Section 404D. And the reasonableness would embrace a duty to investigate? No. A duty to — certainly a duty to investigate could arise under certain circumstances. And I will note that for all their disclaiming of a duty to investigate, Bank of Franklin did find it necessary to, in two separate camps, actually go out and investigate. But simply these particular instruments, and these are the extraordinary circumstances here, were so irregular on their face and so unusual and in such high dollar amounts and volume and velocity that the only real duty is to just not accept them, to not process them. The last question I'll ask is because I would have thought the more developed area of law to impose liability would be the common law negligence because it does have limiting principles. And if that is my leaning in this case, what evidence does there exist as to actual knowledge of fraud? What would you point to here prior to his confessing to everyone? In 2011, these investigations that I'm bringing up, the highest levels of — the highest officers in the bank organization, the CEO, the chief compliance officer, the chief credit officer, everybody charged with detecting fraud became aware of these. And they went out and undertook this investigation. They reviewed documents. And they talked to Mr. Rawls. And in a memo exchanged between the loan officer and the bank's president, they specifically reference risks associated with Mr. Rawls' checking practices and the fact that Midwest Feeders was specifically identified in that memo and the line of credit that it was extending to Mr. Rawls. The December memo does to me show they were aware of the fiduciary relationship, if we want to call it fiduciary, which it probably would be. But what does it say about their knowledge of actual fraud that he's thieving from them? Well, I think if they — if you were going to put in a memo, we have actual knowledge of a fraud, then they would have closed the account and we wouldn't be here. They had constructive knowledge, or our conspiracy theory is that there was a tacit agreement to look the other way because they had everything — On that, Delta Chemical seems to describe what you have here, friendship and business profiting, as short of sufficient. The friendship provided a nice vehicle for this, but it's not the — it's not really what cemented this. It is all these suspicious circumstances in an industry, a heavily regulated industry, where you're supposed to look for suspicious circumstances. And in fact, suspicious circumstances both in 2011 and over and over again after 2011 came up, and you have the bank ignoring these for no apparent reason other than the financial gain that could be received. Let me accept that for a moment. But let's suppose that Mr. Rawls here lived pretty high, and he had a big fancy home and a ranch, and he had a large mortgage on him. And as a result of this, he didn't pay his mortgage, and the lending company foreclosed, and they've got a million-dollar deficiency out there. Have they got a claim, too? No, they don't. Why not? Because the conducted issue is not running up a tab. It's not the fact that Mr. Rawls was being dishonest and using his money through ill-gotten gains or even the fact that he had a bank account. It's that he — the linchpin, the actual scheme itself was fake checks, very suspicious checks that banks are supposed to catch, and that it's — again, it's not just a typical fraud scheme that happened to involve a bank. They're bearing a loss as a result of this bad conduct. But they're not bearing a loss as a result of the fact that he — well, they're not the ones charged necessarily, as I think I understand your example, with preventing the deposit. If I go rob, you know, several stores or people and happen to deposit my ill-gotten gains in a bank, the bank doesn't have to ask where I got that money or anything else. But banks do — are supposed to scrutinize instruments prevented. That's what 404D provides and several other provisions of both State and Federal law. Well, they would be — they would be, under your analysis, though, they would — they would bear the loss resulting from an imposter check while — but who are not themselves partners of the check or holders of them. The lender — the mortgage lender here was not a part of any of this. But nonetheless, as you read this statute, the liability would extend to all of those people who fail. This kind of limitless liability that flows from that kind of a causal relationship we dealt with in other contexts, in the Maritime Law, for example. And this court on Bonk adopted a pragmatic limitation to the — to causation in the — to limit the unlimited liability that flows from blocking the Mississippi River all the way up the middle of the country. And we said there, applying Harper v. Tort principles, that — that only — that you could not recover unless you had a — you could not cover for economic loss absent a direct injury to — to you. Now, that's just a pragmatic limitation. And the real — the driver of that in Tort analysis is that — that you have first-party liability out there in insurance care and so on. And this is — this type of difficulty in limitless liability is the same thing that's present here. And that's what troubles me, is that I don't see, if you read it that way, as you're reading it, that you just happen to be another bank, but you're another creditor. And the causation of your loss is this guy's bad conduct, right? Yes? Go ahead. Yes. May I answer? Thank you. One of the causes is this gentleman's conduct. I would submit that we don't think it's nearly as attenuated as the maritime example you gave. And in the confines of this particular case — and, again, person bearing the loss is — that's not a common-loss standard or one we're trying to slip in here. That's a statute. It's not attenuated in the maritime law, so that you close the river and you have people all the way upstream to the country that have suffered economic loss because the river traffic can't flow because they've got goods sitting on the side of the — on the wharfs all the way up the river, et cetera. It's hundreds of millions of dollars, et cetera, and no direct loss. Now, logically, yes, there's a causal relationship, but the law just doesn't go that far. And I'm just suggesting to you that that's just an example, not — of the reality of defining limits of liability. And I don't hear any limit of liability here, other than you're a bank, too. There certainly are limits within the negligence realm. In the statutory realm, I'll concede it. You know, person bearing the loss is much broader than a party to the instrument or a party entitled to enforce the instrument. But that's what the legislature chose. The language of 733-404-D could not bring a suit that — where you determine here that resulting from an — bear the loss resulting from an imposter check — there's a lawsuit from the imposter check — but are not themselves parties to the check or holders of it. Now, that's that last phrase, they're not parties to it. Now, what are the limits of that? That's a problem. That's it. The problem, and I don't see how — I'm having trouble seeing how — I don't hear you articulating a limitation to that, a principle one. Well, banks and those accepting checks accept responsibility. They enter a fraud-laden and complex field, and they make money from it. And so the only reason I can offer is that the Georgia legislature — I'm sorry, the Mississippi legislature in its judgment and the drafters of the UCC adopted a correspondingly broad scope of standing and liability. To protect banks but not mortgage lenders. Well, every statute has to pick and choose who it protects and who it penalizes and the scope of those protections and penalties. I understand. Thank you. Thank you. Mr. Wan. May it please the Court. My name is Mark Wan, and I represent the Bank of Franklin. Midwest Feeders is asking this Court, in this case, to extend the liability of a bank to a place where no other court has been willing to go. This is one of three lawsuits that Midwest Feeders has filed against three different banks as a result of alleged fraud in their cattle-clearing business. In one of those other cases in Georgia, which was brought against someone other than Robert Rawls, the district court granted the motion to dismiss the case against the bank, and an oral argument was heard on that case on December 13, and on Wednesday of this week, the 11th Circuit affirmed the district court's dismissal of the claims, essentially the same claims we have in this case. Mr. Sandberg is talking about the fact that the Mississippi legislature has supposedly adopted a rule that any person bearing the loss under 3404 can bring a claim. And that is not the case. The same language was considered by the 11th Circuit in the case against Regions Bank, and they rejected that argument. Judge Bramlett said that that language, person bearing the loss, cannot be read in a vacuum, and he cited the Manufab, Inc. case out of the Mississippi Supreme Court that says, the court looks to the whole of a statute to avoid adhering to one sentence or phrase in a way that skews its true meaning. To read 3404 in a way that any person bearing a loss can bring a claim is to disregard the entire purpose of Article III and Section 3404, which is a comparative liability provision which apportions liability between the parties to an instrument. You can, there is one line that's out there, I don't suggest it's adequate, but this is a competitor. These banks were competing for this, for Rawls Business, I gather, right? And so they were well aware of the, Franklin was well aware of the other banks that were involved in this, that also were involved in lending money to Rawls. Are you talking about other banks in Mississippi or the other banks in the? Other banks, period. Well, the only other bank that Banker Franklin had knowledge about that was lending money to Rawls was the bank that he used before. Alva. Oh, you're talking about Alva. Okay. Well, no, I understand what you're saying now. There is no evidence that Banker Franklin was privy to the contractual relationship between Alva State Bank, Robert Rawls, and Midwest Feeders. In fact, in discovery in this lawsuit is the first time Banker Franklin became aware of that arrangement and how it worked. So Midwest Feeders is suggesting, because there's a memo in December of 2011, which was basically talking about an issue that came up with the fact that the bank was not charging interest on uncollected funds and also about making sure the bank was secured, which is their obligation to do. There's nothing in there. They assumed the banking relationship with Robert Rawls. There was a piece of real estate that was to secure the line of credit in another loan. When they did the title search, in the title search it was revealed that Midwest Feeders had a lien on the property. They asked Robert Rawls about that. He said he had a line of credit with Midwest Feeders. They requested, at his insistence, they requested that Midwest Feeders make their lien subordinate to that of Banker Franklin. They agreed to do it. That memo actually proves that Banker Franklin did not understand the arrangement, because in that memo they suggest their understanding is that Robert Rawls has a line of credit with Alva State Bank and a line of credit with Midwest Feeders. There wasn't a line of credit with Alva State Bank. And even the It was just a depository. Yes. And even the, what was called a line of credit, what Robert Rawls described as a line of credit with Midwest Feeders, was actually a promissory note. There was a security agreement, there was a promissory note for $7 million, and then there was a deposit account control agreement. There is not one shred of evidence in the record that Banker Franklin understood how this cattle clearing arrangement worked until this lawsuit was filed and those documents were obtained. They had no relationship with Midwest Feeders. Midwest Feeders was not a customer. Midwest Feeders was not a party to the check. Midwest Feeders is not a party entitled to enforce the instrument under the UCC. Midwest Feeders is not an aggrieved party. And Midwest Feeders is not a party because they were not a party to the instrument. And Judge Bramlett was correct in saying that given all of those specific definitions as to who can and cannot recover under Article III, to take person bearing the loss and say, well, that doesn't mean person bearing the loss that has a right to recovery or a right to enforce the instrument. That just means anybody. So if we buy this proposition, banking in the Fifth Circuit would look something like Robert Rawls comes in with dozens of checks, and suddenly the teller has to say, well, who are these people? Are these people real? Did you see them sign the check? Is anyone else funding the check? The Eleventh Circuit case relied, disposed of the common law argument by saying it was preempted. That has not been argued in this case. I think they said the conversion, common law claim for conversion was preempted. But there's been no argument as to preemption in this case. Well, the Midwest Feeders did not brief common law conversion in their briefs before this court. I believe Judge Bramlett did find that the UCC preempted a common law cause of action for conversion, and Midwest Feeders did not argue otherwise, and so we assume that they had abandoned that argument about common law conversion. But the court in Georgia also said that the common law conversion was preempted by the UCC. But whichever one you're going by, Midwest Feeders has to show that they have an interest in the checks. Would you concede that under some extraordinary circumstances there might be liability if the bank, your bank knew exactly what was going on and went along with it? I mean, I'm not saying that happened, but are there exceptional circumstances that would, could apply in other situations? Well, let me answer it in two ways. We submitted a case that just came down from the Eastern District of California on, I think, December 20th. And in that case, it was a case against the bank by a non-customer alleging that the bank should have monitored their customer's account, basically saying that the bank should have protected the non-customer from the intentional torts of its customer. Well, the Fifth Circuit in the Cheney case said banks do not have a duty to non-customers to protect them from the intentional torts of their customers. The Evans case was so important because one of the claims was conspiracy to commit fraud. And the court in California said there is no duty to a non-customer to monitor the bank customer's account or to even report. That case said even if they knew their customer was laundering money, they had no duty to report that to the non-customer that was the victim of that. In fact, it said federal law prohibits them from communicating. Now, there are all sorts of, under the Bank Secrecy Act, there are all sorts of reports. You can do the government's suspicious activity reports, but there's no private cause of action under those and the duty is owed to the government. But that 28J case, District Court out of California, that you've just given us, is very hard for me to reconcile with the Holifield case out of Mississippi and our own Cheney case, where it seemed to be much more in line with what I thought is a near consensus, that if there is actual knowledge of the fraud, then the unknowledge is going to be lost. Well, that is true. And the Holifield case … So what's the position you're urging in this case? Are you urging the stretch that the Evans court stated, or do you think we should stick with what I see Mississippi law to be? No, because there's no evidence in this case that Banker Franklin had knowledge of the fraud. And in the Holifield case, Judge Southwick said that the bank had to have actual knowledge of the fraud. And he defined actual knowledge as at the time of the transaction, they have to know that the customer is defrauding someone. There is absolutely no evidence in this case. Now, I want to answer your question. You said, what would extraordinary circumstances be where a bank might owe a duty to a non-customer? Well, obviously, if the non-customer is a party to the instrument, then you owe a duty under the UCC. And Midwest Feeders has sort of conflated those two, and they've taken cases where a duty was owed under the UCC and said, see, a duty is owed to a non-customer right here. But that's because they were a party to the instrument. Midwest Feeders was neither a party to the instrument or a customer. Another situation, there are cases where a bank can assume a duty it would not otherwise have. And a couple of examples of that, there's a case where a bank allowed non-customers to use a lockbox, and there was a problem with theft. And even though they ordinarily wouldn't owe a duty to a non-customer, they actually assumed a duty by letting them use their lockbox and they were putting rent checks owed to the bank's customer. That's one example. Another example is where a bank makes a representation to a customer. There's a case that the bank actually made representations encouraging the customer to invest in their, they encouraged the non-customer to invest in the bank customer's investment scheme. And they had knowledge that the scheme was not, that it was not a good thing to do. And those people were able to sue them for misrepresentation because they assumed a duty they wouldn't have, and they had relied on it. Midwest Feeders has asserted no representation the Bank of Frank ever made to them about anything. I want to mention a couple of other things. The judgment against Mr. Rawls, I think there has been between $6 and $7 million collected on that. So Mr. Sinbrick said that it was uncollectible, but I think that's not exactly accurate. As far as the conversion, Midwest Feeders confuses an interest in the money, funding the checks with an interest in the check itself. And the Antico case of the Seventh Circuit makes it clear. Article III is about negotiable instruments. It's not about money. And in Antico, the plaintiff actually had a stronger argument that they had some interest in the proceeds of the check because the payee of the check under contract was supposed to write a check for most of the money after the payee deducted their fees to the plaintiff. And even that was not sufficient to show an interest in the proceeds because the plaintiff was not a party to the check. They said their rights are under the ancillary contract between them and the payee of the check, not pursuant to the instrument. The same thing is true here. Robert Rawls and Alvestate Bank had a contract with Midwest Feeders, and Robert Rawls allegedly violated the terms of that contract. Bank of Franklin didn't know what the terms of that contract were. As far as Bank of Franklin, under the rule of negotiable instruments, he had a checking account or an account at Alvestate Bank, and he had the right to write checks on it. He was doing exactly what he had the right to do. He could have written himself a check, because the account where this money originated was in the name of Robert Rawls Livestock. It ended up in another account at Bank of Franklin in the name of Robert Rawls Livestock. He could have written a check on the first account from Alvestate Bank to Robert Rawls Livestock and deposited it, and Bank of Franklin would have had to honor that check. The Antico case talks about the fundamental axiom of Article III, that banks have to pay the payee, because if they don't, without a good reason, then the system does not work. What do you understand the district court to have ruled here, that your bank had no duty at all, what I think of as the Evans rule, to the non-customer, or did the district court, and I'm focusing on the ruling that we're reviewing, decide, yes, you could have it, but there are no facts to show actual knowledge? I think Judge Bramlett said that there was no evidence that Bank of Franklin had any knowledge of the fraud, and there is no evidence. Even the internal memorandum of Bank of Franklin, one of the internal committees, one of the bankers, officers, was bothered by the levels of unfunded liability. That's understandable. Also, in banking parlance, that's a big flag of kiting, right? Well, possibly, but his concern, if you read the memo at the very beginning, his concern was that the bank was not charging interest on that, and that's why Mr. Rawls had left his prior bank, because they had not been charging him interest, and then they started charging him interest on uncollected funds, and so that's why he came to Bank of Franklin. Well, that's just part of the same thing, unfunded liabilities, and basically we're lending him money is what it amounts to, and we're not getting paid for it. But that also means that the lending is not the he's writing his own loan deals, and nobody's looking at the loan arrangements itself for security or anything else. Well, the purpose of the memo was to make sure that it was. Well, anyway, the point I want to suggest to you is that Franklin Bank did have a number of warnings about his conduct and the concern about it. I don't mean about his financial arrangements, et cetera, and his ability to pay. But there were concerns about that, and he was overridden, that particular officer was. I think his concern, if you look at his deposition, his main concern was that they were not making money on the uncollected funds. I don't think it was about being suspicious he was doing anything wrong. And let me say this. He didn't say anything about kiting in that memo? I don't believe so. Oh, okay. I'm pretty sure he did not. I would be making a different argument if he did. But I want to say one thing real quick about I think Mr. Sandberg said there's no business reason for these checks. They were beyond suspicious. Even though Bank of Franklin owed Midwest Feeders no duty to look into this, even if everything is true that it was suspicious and that Bank of Franklin did not use good banking practices, there's no duty owed to Midwest Feeders. But that being said, when these checks came up, there was nothing illegal about them. But the bank officer did, was told to ask them, why are you doing the checks this way where you write it to somebody and they give you the check back? And he told them, well, whenever I am paying someone for their cattle, sometimes they want me to invest the money in a new lot of cattle and grow the herd. And so instead of me writing them a check and them writing me a check, I write them a check. They sign it over. Midwest Feeders says that's an absurd explanation. But interestingly, in one of their own cases, the Dahlgren case, this was not the big issue being considered by the court. But in that case, they make the comment, investors commonly use their share of the sale proceeds to finance a new lot of cattle. So apparently it's not that absurd. And even more important is the fact that Jeff Sternberger, the president of Midwest Feeders, in his individual definition, and this is record on appeal at 3971, 3972, basically testified that he accepted the same explanation when Robert Rawls was asked about why he had so many aged accounts receivable. And you had mentioned something earlier. Even if Midwest Feeders is correct and 3404 is open to anybody, anywhere who suffered a loss, regardless of whether they're party to the instrument, even if that's true, which it's not, they can only recover if the transaction was the cause of their loss. When Bank of Franklin allowed that check to be deposited, that's not when Midwest Feeders suffered a loss. The check then went to Alvestate Bank, who did know about the terms of this cattle clearing business, how it was supposed to be done, what the checks were supposed to be used for. After Alvestate Bank honored the check, which they did, every single check until March 2014. After that, Midwest Feeders would fund the check by putting money in the account. So that's where the loss occurred. The loss occurred because they gave a person the right to draw instruments on this account at Alvestate Bank without limitation, without any knowledge by Bank of Franklin of any restrictions. He did exactly what he was given the right to do. They allowed him to put negotiable instruments that they had no legal interest in, into the stream of commerce in the world of the UCC. They assumed the risk. Their loss was caused by the fact that Robert Rawls allegedly breached their contract. They have sued Robert Rawls for that. And in the Kansas case, they said Robert Rawls caused the loss. They got a judgment. Whether he's able to pay that judgment or not is not relevant to whether there's claimings to make. And I see my time is up. I've been given permission to ask two questions. One is, could you respond quickly to his reliance on Hans Financial? Yes. And then actually, since you won't be stepping back up, if you could address the sanctions motion issue just quickly, that would be helpful. Okay. Hans. Hans, the plaintiff, was the intended payee. The party who is intended to be the person who is intended to be the payee is defined in 753110 as the person that the issuer intended for the money to go to. In Hans, the plaintiffs were actually the intended payee. They were a party to the check. They had a right under the UCC to recover. Totally different situation. Midwest Feeders never claimed that it was entitled to these checks. Okay. Now, the other thing about Hans, it did not analyze that case under a statute substantially  They actually, so they're incorrect. Okay. They went under the statute that deals with employee responsibility for fraudulent endorsements of an employee. So those are the two distinctions. Sanctions motion. Bank of Franklin was never given an opportunity to respond to the motion, but I will say that we vehemently deny the allegations and that to this day, Midwest Feeders is in possession of every insurance contract. I'm sure you do. And I'm not implying otherwise, but it's just hard to see it as moot by virtue of the ruling in the case. If the misconduct were true, wouldn't they be entitled to the fees? Well, a district judge has broad discretion to conduct discovery in his court. Judge Bramlett has been with this case from the very beginning for a period of years. And whenever he, and it was really interesting the way it happened, they filed their motion and I think his opinion came out a few hours later. So the parties emailed and said, do you want us to respond to this? We denied this. Would you like us to respond? And he, there's an email in the record where he replied and said, no, the issue's moot. We cited law in our brief that says that a motion is effectively denied. On merits. If there's a final judgment entered. But to answer your question, there's no question that the motion is considered to be denied. There's no question that he has discretion, Judge Bramlett has discretion to conduct discovery in his courts, and there has to be an abuse of discretion to find that he was incorrect. Abuse of discretion must. Okay. So the answer is standard of review as opposed to any way we could perceive a merits resolution of that. Yes, and then on the Fifth Circuit case of Tollett v. City of Kemah, the abuse of discretion, you have to show an erroneous view of the law or a clearly erroneous assessment of the evidence. Okay. And so basically our position is there's no evidence that he abused his discretion in doing that as a judge who had been dealing with the case for some instance. Thank you. Thank you. Mr. Sandberg. Is there a factual question with regard to whether there was knowledge of any fraud going on that would require trial? Yes. We would characterize it as precisely that. We would say that there is evidence providing at a minimum a reasonable inference, but probably much more than that, that there was fraud going on and that Midwest Feeders would be victimized by that fraud. Well, it's not that fraud's going on. It's Banker Franklin knew of the fraud. Yes. And so what's the best piece of evidence of that prior to his confession? First of all, it's probably not one best piece, but the check-kiting amounts. Well, the nature of these instruments and the dollar amounts and the velocity and the volume. We also have the fact that Mr. Rawls was passing checks that had no endorsement at all on them. He was passing checks that had an endorsement of four deposit only, even though that's not a proper endorsement of the UCC. And Banker Franklin's own policies internally noted that, and yet they were going through anyway. We have a check to this, you know, a check made out to Banker Franklin's president, and we have this contrived investigation and this completely implausible explanation. All of them. Is his friend internally, what was his name, McGee? Yes, Mr. McGee. Is there any suggestion that McGee was aware there were the false invoices for the cattle? No. I want to address the Regents' case. That case was dismissed at the Rule 12 stage, and the district court here ruled that Midwest Theaters properly pled all claims except for one of its conversion claims. And Regents did not have the extraordinary facts that are present here. And it's those extraordinary facts that distinguish this case from all of the other universal rule cases, right up to the Evans case from last week, which said there's no duty owed to a non-customer unless extraordinary and specific facts are present, which they are here. The duties disclaimed in Evans were a duty to prevent commingling or to monitor or to conduct an investigation or to tell some third party about what a bank customer is doing. That is not the duties that we are claiming here. Again, we go back to a simple don't accept checks that are facially suspicious. Certainly don't accept them after you become aware that there's possible criminal implications. Circuit courts disagree all the time, and we would submit that the Eleventh Circuit erred in its holding in Regents. This Court has hundreds of pages of briefing and thousands of pages of records. And had Regents had that same — had the Eleventh Circuit had that same background and had it carefully and comprehensively analyzed the issues, then it might have some persuasive value. But the Regents' opinion spans less than two pages, and many of the issues that we are all talking about here today aren't even touched in that opinion. We will acknowledge that statutes are to be read harmoniously, but reading statutes harmoniously does not mean that you go out and search for conflicts where those don't exist, and it doesn't mean that you ignore plain language like person bearing the loss, and it doesn't mean that you assume that the legislature meant party entitled to enforce the instrument, even though it had that exact term at its ready and chose not to include that in a particular statute. We can debate the wisdom or the policy implications of extending in the statute liability or a remedy to all those bearing the loss, but what we can't debate is that's what the legislature chose to use. That is the language that they chose. Now, on the negligence front, we would submit that all of the arguments made by Bank of Franklin raise nothing more than factual issues. Evidence of actual knowledge or constructive knowledge are for a jury, not for the court. Evidence of the — of knowledge of the Rawls-Alva-Midwest-Feeders relationship are factual issues. In just the few seconds left, do you have a thought on that motion, the sanctions motion? Yes, Your Honor. First of all, that didn't arise out of some suspicion. Bank of Franklin filed a separate lawsuit disclosing multiple policies that they took the position provided coverage for this case and that were never — never disclosed as required under Rule 26a1. What we didn't hear today and what we've never heard is an explanation for how that could have happened. The court did not enter a ruling on that motion. It sent an e-mail, and the only basis for that was mootness. Mootness is a legal issue that this Court reviews for — at a higher standard than abuse of discretion. Thank you, Your Honors. Thank you. Thank you.